1   COOLEY LLP
    PATRICK GUNN (172258) (pgunn@cooley.com)
2   101 California Street
    5th Floor
3   San Francisco, CA  94111-5800
    Telephone:     (415) 693-2000
4   Facsimile:      (415) 693-2222

5   CLEARY GOTTLIEB STEEN & HAMILTON LLP
    JEFFREY ROSENTHAL (*pro hac vice*)
6   (jrosenthal@cgsh.com)
    DARRYL STEIN (*pro hac vice*)
7   (dstein@cgsh.com)
    One Liberty Plaza
8   New York, NY 10006
    Telephone:     (212) 225-2000
9   Facsimile:      (212) 225-3999

10  Attorneys for Respondents
    OPEN TEXT CORPORATION and
11  OPEN TEXT Inc.

12                    UNITED STATES DISTRICT COURT

13                   NORTHERN DISTRICT OF CALIFORNIA

14                       SAN FRANCISCO DIVISION

15

16
    KEVIN COCHRANE, an individual,          Case No. 4:15-cv-01234-WHA
17
                    Petitioner,             **EXHIBIT NO. 6 TO DECLARATION OF**
18                                          **DARRYL STEIN IN SUPPORT OF**
              v.                            **RESPONDENTS' MOTION TO VACATE**
19                                          **ARBITRATION AWARD**
    OPEN TEXT CORPORATION, a Canadian
20  corporation and OPEN TEXT INC., a       Date:        June 11, 2015
    Delaware corporation,                   Time:        8:00 a.m.
21                                          Courtroom:   8 – 19th Floor
                    Respondents.            Judge:       Hon. William Alsup
22
                                            Motion Filed: April 24, 2015
23
                                            **[Redacted Version]**
24

25

26

27

28

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| KEVIN COCHRANE,<br><br>    Claimant,<br><br>v.<br><br>OPEN TEXT CORPORATION and OPEN TEXT INC.,<br><br>    Respondents. | **RESPONDENTS' RESPONSE TO CLAIMANT'S DEMAND FOR ARBITRATION** |

1. Respondents Open Text Corporation and Open Text Inc. ("OpenText" or the "Company"), by and through its undersigned counsel, as and for its response to Claimant's Demand for Arbitration, dated August 20, 2014 (the "Demand"), respectfully states as follows:

PRELIMINARY STATEMENT

2. Claimant has filed a baseless arbitration demand that not only neglects his clear failure to satisfy the prerequisites for any variable compensation payment, but it seeks payment of an inflated bonus several times greater than the amount Claimant could have received had he not resigned his job at OpenText.

3. The material facts are essentially uncontested.  Despite his acute awareness of the unambiguous requirements of his Employment Agreement and Incentive Compensation Plan for entitlement to year-end variable compensation (indeed, by coincidence, Mr. Cochrane was reminded of it four days earlier), Mr. Cochrane unilaterally announced his resignation as OpenText's Chief Marketing Officer on April 14, 2014.  He confirmed his resignation in writing that same day.

4. Mr. Cochrane's resignation was unconditional and, contrary to his allegation, it was not provided with 90-days' notice.  His email confirms this – it suggests that OpenText

immediately hire his replacement and offers his assistance with the transition to his replacement, but never states or even suggests that Mr. Cochrane would continue to work for 90 more days or after June 30, 2014. As he was repeatedly informed thereafter prior to the date of his departure, the timing of his decision to resign disqualified him from receiving year-end variable compensation.

5. After OpenText generously offered him a prorated bonus – which it clearly had no obligation to do under Mr. Cochrane's Employment Agreement – Mr. Cochrane began to assert that his resignation was actually only a 90-day notice. But for multiple reasons, this issue is irrelevant. Mr. Cochrane's Employment Agreement clearly makes his entitlement to variable compensation contingent upon his continued employment on the *payment date* of such compensation, which occurred in August 2014. Mr. Cochrane does not allege – nor could he – that he was employed, or ever intended to be employed, by OpenText in August 2014. And even had his Employment Agreement not required him to remain employed through the payment date, and even had he provided notice of his intent to continue working until July 14, 2014 as he alleges, Mr. Cochrane's employment indisputably ended on May 2, 2014, the only relevant separation date under the terms of his contract.

6. Particularly egregious is Claimant's Demand for a bonus of $474,000. Even had Mr. Cochrane earned a bonus under the terms of his Employment Agreement, his inflated demand is based on outdated targets set prior to OpenText's billion dollar acquisition in January 2014. Not only did OpenText have the right to adjust its targets based on acquisitions, which it exercised twice in FY2014, but in demanding a bonus based on unadjusted targets different from those applicable to every other employee participating in the variable compensation plan, Mr. Cochrane seeks (on a percentage basis) variable compensation that is several orders of

magnitude higher than any other OpenText employee and inconsistent with OpenText's own public disclosures in its SEC filings.

ANSWER

**I.    Mr. Cochrane Is Not Entitled to Any Bonus**

7.     Under the express terms of Mr. Cochrane's Employment Agreement and Incentive Compensation Plan, he is not entitled to any bonus.

8.     First, while Mr. Cochrane's account of his departure is incorrect, it is also irrelevant insofar as Mr. Cochrane has no entitlement to a bonus even accepting as true all of his allegations.  According to Mr. Cochrane, he provided 90-days' notice of his resignation on April 14, 2014, (Demand ¶ 7), which would have placed his resignation in mid-July 2014.[1]  But Section 2(b) of Mr. Cochrane's Employment Agreement is unambiguous – entitlement to variable compensation is "subject to the Executive's employment with the Corporation through the applicable *payment date* for any such Variable Compensation."  (Demand Ex. 1 at § 2(b) (emphasis added)).  This requirement is reiterated in OpenText's FY14 Incentive Compensation Plan (the "Plan"), annexed hereto as Exhibit A.[2]  The Plan provides unambiguously that

> In the event of a voluntary resignation, if an employee's last working day is prior to the incentive plan's period payment date, in either the quarterly or annual plan, the quarterly or annual payment will be forfeited.  As such, employees must be present on the day of payment to receive the payment.

(the "Voluntary Resignation Provision") (Ex. A at p. 7).

9.     As the evidence at the hearing will indisputably establish, the relevant payment date for the variable compensation plan occurred in August 2014.  Indeed, when he resigned, Mr.

---

[1]     Mr. Cochrane alleges that he was asked to be "on call" through July 14, 2014, Demand ¶ 12, but this request was made in writing as part of the offer that he rejected, as discussed below.

[2]     The Plan is referenced in, and governs, Exhibit 3 to the Demand, the document upon which Mr. Cochrane relies in seeking variable compensation.  *See* Demand Ex. 3 at p. 3 ("I have read and understood both the Fiscal Year 2014 Incentive Compensation Plan Document* and Incentive Compensation Agreement and accept and agree to the regulations stated within.") (asterisk in original)

3

Cochrane was aware of this timing.  As the Plan specifies under the heading entitled "Timing of Payments," "Annual and Q4 payments will not be made until next regular payroll cycle after the Board of Directors meeting, which is normally held in late August."  (Ex. A at p. 4).  Because even Mr. Cochrane does not contend that he worked – or ever provided notice that he would work – through August 2014, he was not eligible for a bonus, regardless of what notice he gave or when he ceased work.

10.    Second, even if one ignores the payment date requirement in both the Employment Agreement and the Plan, Mr. Cochrane still would not be entitled to a bonus because his actual employment with OpenText indisputably ended before June 30, 2014, the last day of FY2014.

11.    Mr. Cochrane alleges that he gave 90-days' notice on April 14, 2014 such that his employment would have lasted just beyond the June 30 fiscal year end.  Not only will the evidentiary record at the hearing disprove Mr. Cochrane's allegations regarding his notice, but any such notice he provided was superseded by Mr. Cochrane's cessation of work for OpenText on May 2, 2014, which resulted in his "Separation from Service" under Section 3 of his Employment Agreement.

12.    With regard to Mr. Cochrane's claimed 90-days' notice, while immaterial in light of the binding contractual language, the e-mail Mr. Cochrane sent to Messrs. Barranchea and Sousa shows that no such notice was given.[3]  While claiming that he told his boss (CEO Mark Barrenechea) on April 14, 2014 "that he intended to resign after a 90-day notice period," (Demand ¶ 7), his confirming email nowhere mentions 90 days.  Rather, "to confirm in writing our conversation," Mr. Cochrane wrote that "it is the right time for OpenText to begin looking for a new CMO to help execute FY15 and future plans."  (Ex. B at p. 1). Indeed, Mr. Cochrane

---

[3]    A true and correct copy of this e-mail is attached hereto as Exhibit B.

stated his intent to "continue to execute my function to my fullest extent possible and be an able and willing contributor to both Q4 execution and FY15 *plans*," making clear that he intended to depart during the present quarter (i.e., before June 30, 2014) and not on July 14 as he now claims.  (Ex. B at p. 1 (emphasis added)).  Nowhere in his e-mail does Mr. Cochrane express any willingness to assist OpenText with respect to FY2015 (commencing on July 1, 2014) other than with respect to "plans," as distinct from "execution."  Particularly given that Mr. Cochrane bears the burden of proof in this proceeding, the only reasonable conclusion to draw from his written resignation is that Mr. Cochrane did not have – nor did he advise OpenText of – any intention to work for an additional 90 days at the time of his resignation.

13.     Regardless of the notice Mr. Cochrane provided, his employment ended long before the fiscal year end by his own actions, as specified in Section 3 of his Employment Agreement.  (Demand Ex. 1 at §3).  Section 3 provides that "the Executive's Separation from Service shall be deemed to occur when the level of services performed by the Executive for the Corporation decreases to a level equal to 20% or less of the average level of services performed by the Executive for the Corporation during the immediately preceding 36-month period. . . ." (*Id.*).  For Mr. Cochrane, that occurred almost immediately after his April 14, 2014 announcement.  Thus, having largely stopped coming into his office to work, he was advised to come to the office on May 2, 2014 to "drop off" his laptop and badge, as Mr. Cochrane himself alleges.  (Demand ¶ 14).[4]

14.     The only evidence supporting Mr. Cochrane's claim that his employment continued past the June 30, 2014 year end (an irrelevant date to begin with, as discussed above) is his improper reliance on OpenText's generous *settlement proposal*.  In his Demand, Mr.

---

[4]     While irrelevant to Mr. Cochrane's claim, any claimed surprise in the Demand at the events of Friday, May 2, 2014 is without basis.  Mr. Cochrane and OpenText had been discussing (including in writing) his departure on that day for the entire week leading up to his formal separation.

Cochrane refers to "a letter from Sousa stating that Cochrane held the position of Chief Marketing Office and was a full-time employee from February 4, 2013 to July 14, 2014." (Demand ¶ 16).  But that "letter" is an *unsigned draft* offered to Mr. Cochrane as part of a proposed settlement.  Even though Mr. Cochrane relinquished any entitlement to a bonus due to his voluntary departure before the payment date – a fact of which he was repeatedly informed, notwithstanding Mr. Cochrane's allegations to the contrary – OpenText was willing to pay Mr. Cochrane's variable compensation amount prorated through his actual departure date of May 2, 2014.  Mr. Cochrane refused that offer and therefore is limited by his contractual entitlement, not what OpenText had offered.  And Mr. Cochrane certainly may not rely upon the unsigned draft settlement letter as evidence of his continued employment past the end of the fiscal year.

15.     Indeed, even had Mr. Cochrane been terminated by OpenText without cause (as opposed to resigning), he would still not be entitled to any more than what OpenText offered – the prorated portion of his bonus.  While the Plan clearly provides that employees who depart voluntarily before the applicable payment date receive no variable compensation, had Mr. Cochrane been involuntarily terminated by OpenText prior to late August 2014, the Plan mandates that any incentive compensation payment be prorated based on his "last day of active employment," which was May 2, 2014.  (Ex. A at p. 7).  It provides that in the event of an Involuntary Termination, "the employee's eligibility to participate in the ICP will end on the employee's last day of active employment (last official workday known as the Last Working Day; not official Termination Date or End of Notice Period)… Employees who are involuntarily terminated are eligible for a prorated payout up to the last working day based on 100% of annual target variable compensation."  (*Id.*).

16.     What makes Mr. Cochrane's arbitration demand most outrageous is that merely four days before he tendered his resignation, Mr. Cochrane was reminded of OpenText's policy that – without exception – employees who depart prior to the payment date of a year-end or quarter-end bonus are ineligible to be paid a bonus.  In a remarkable coincidence, on April 10, 2014, an employee named Nigel Williams – who had resigned effective April 30, *after* the end of the third quarter but *before* the payment date of quarterly variable compensation – emailed Mr. Cochrane to seek his assistance in advocating for an exception to OpenText's written policy requiring employment on the payment date.[5]  Mr. Williams sent Mr. Cochrane the written policy quoted above and wrote in his cover email "Standard policy on final VC [variable compensation] payment is that the employee needs to still be working two months after the quarter end (ie still in service when the payout is paid as standard…"  (Ex. C).   In response, Mr. Cochrane wrote to Human Resources seeking an "exception" on Mr. Williams' behalf.  The HR representative offered to look into the matter and get back to Mr. Cochrane, but advised him that "I have *never* seen an exception be made." (*Id.*) (emphasis added).

17.     Just four days after being reminded of OpenText's written policy – which was without known exception – Mr. Cochrane voluntarily tendered his resignation.  Whether one believes that he offered 90 days' notice or not, it is undisputed that such notice period would have ended before the payment date for the year-end variable compensation.

18.     Then, on April 30, 2014, he received a follow up email from HR concerning Mr. Williams in which he was advised that "I don't think this [the request for an exception] is going to fly."[6]  (Ex. D).  Mr. Cochrane was told he could take up the issue with OpenText's chief executive officer, but "I think the likelihood of it being approved is slim."  Just two days later,

---

[5]     A true and correct copy of this e-mail is attached hereto as Exhibit C.
[6]     A true and correct copy of this e-mail is attached hereto as Exhibit D.

Mr. Cochrane departed OpenText and inexplicably rejected its generous offer of a prorated

bonus.  In the face of these emails – thus leaving no doubt as to Mr. Cochrane's knowledge of

the relevant policies and applicable dates prior to both the announcement of his resignation and

his departure – it is truly befuddling that Mr. Cochrane would reject OpenText's remarkable

offer (which it plainly had no obligation to make) and instead pursue this arbitration proceeding

for any reason other than that he believes that the nuisance value would force OpenText to settle.

19.     In sum, Mr. Cochrane is simply not entitled to any bonus for three independent

reasons: he was not employed – and never intended to be employed – on the "applicable payment

date; he did not give 90-days' notice of his intent to remain employed through the end of the

fiscal year, even were that date relevant; and regardless of any notice, he indisputably ceased

providing services to OpenText in excess of 20% of his historical level of engagement prior to

May 2, 2014 and ceased his employment altogether on that date.

## II.  Mr. Cochrane's Bonus, If Any, Must Be Calculated in the Same Manner as the Bonuses of All Other Eligible Executives.

20.     While Mr. Cochrane is not entitled to any variable compensation payment, it is

clear that the amount he seeks is inflated by nearly three-fold.  The only plausible explanation for

his demand is that, cynically, Mr. Cochrane hopes the Tribunal will desire a compromise result

and, therefore, by inflating his claim so drastically, perhaps he will obtain the maximum bonus

he would have received had he remained employed by OpenText through August 2014.  The

unprorated amount of Mr. Cochrane's bonus – had he remained employed until the payment date

in accordance with Section 2(b) of his Employment Agreement – would have been $173,000, an

amount which cannot be the subject of reasonable dispute.

21.     In accordance with Mr. Cochrane's FY2014 Incentive Compensation Agreement

(the "Agreement") (Demand Ex. 3), his target bonus was $200,000, which would be determined

by performance in three categories: 45% by revenues, 45% by adjusted operating income, and

10% by board objectives.  Because OpenText was achieving rapid growth through acquisitions

(among other reasons), the Agreement made crystal clear that employees would not earn super-

sized bonuses merely because targets were exceeded by virtue of acquisitions rather than

performance.  Thus, the parties explicitly agreed in the FY2014 Incentive Compensation

Agreement that:

> Note: These targets are in USD currency and are subject to change as the needs of the
> business require, please see the General Plan Provisions for further clarification and
> process. These targets also include Cordys and **will be adjusted for any future
> acquisitions** during the current Fiscal Year.

This language is noteworthy – Mr. Cochrane and OpenText did not merely agree that targets

"may" be adjusted for future acquisitions, but that they "will" be adjusted.  Indeed, the note

explains that the cited targets – $1,461,720,707 for revenue and $434,744,680 for operating

income – had already been adjusted to reflect an acquisition earlier in the fiscal year.

22.    Reinforcing this agreement, the Plan, incorporated by reference in Exhibit 3, not

only explicitly reserves the right to adjust the targets, but to avoid disputes, it makes clear that

this may be done by the Compensation Review Board and the CEO/President "at their sole

discretion."  (Ex. A at p. 6).  Among the reasons for the adjustment of targets is to reflect "the

impact of acquisitions."  Moreover, the Plan does not require that amended targets be

accompanied by formal documentation, re-issuance of the Plan to employees or an opportunity

for such employees to accept or reject the modifications.  Rather, the Plan states clearly that

adjustments "shall be communicated to Eligible Employees via standard employee

communications," which "shall not require the Plan to be re-issued or Eligible Employees to

provide any further acceptance of the Plan."  (Ex. A at p. 6).

23.     One acquisition made by OpenText early in FY2014 was of Cordys Holding B.V. on August 15, 2013.  As a result, by the time the FY2014 Incentive Compensation Agreement was prepared on September 29, 2013 (three months into FY2014), the targets had already been revised to include Cordys, as discussed above.  On January 16, 2014, OpenText made another material acquisition, purchasing GXS Group, Inc. ("GXS") for $1.2 billion.  As noted in OpenText's SEC Form 10-K for FY2014 ("10-K"), this acquisition increased OpenText's revenue by $211 million and operating income by $8 million.  10-K at 135-136.[7]

24.     Given the size of the GXS acquisition, the approach taken on other acquisitions and the discussions that took place at various executive leadership meetings, every OpenText executive knew that their incentive targets would necessarily be adjusted.  OpenText had a market capitalization of approximately $4 billion at the beginning of FY2014, so a $1.2 billion acquisition such as GXS would obviously have an enormous impact on OpenText's revenue and income results.  Accordingly, these adjustments were not merely ad hoc or discretionary changes; they flowed logically from a fundamental change in OpenText's business operations.

25.     The adjusted targets (the "Adjusted Targets") as a result of the GXS acquisition were for worldwide revenue of $1.666 billion and operating income of $485 million.  These numbers, reflected in OpenText's 10-K, were used to calculate the variable compensation payments for all eligible employees.  10-K at 71.  While the 10-K only shows the variable compensation paid to five senior executives, there were approximately one hundred other employees participating in this short-term incentive compensation program, all of whom received bonus payments in accordance with the Adjusted Targets; not one has ever suggested that he or she was entitled to be paid according to any other metric.  The necessary adjustments

---

[7]     The pertinent pages from OpenText's publicly-filed SEC Form 10-K for FY2014 are attached hereto as Exhibit E.

to the targets as a result of the GXS acquisition were widely known throughout OpenText; one need not have been among the senior-most executives like Mr. Cochrane to be aware of this fact.

26.     Mr. Cochrane, however, seeks to conceal the Adjusted Targets from this Tribunal in order to claim a bonus that is nearly triple the maximum to which he would be entitled had he remained with the Company (if he is entitled to any bonus despite his departure).  As a result, Mr. Cochrane seeks variable compensation greater than that paid to any other OpenText employee in FY2014 besides its chief executive officer.

27.     Mr. Cochrane's Demand lays out his assessment of OpenText's target category performance, but the Company actually already did these calculations in filing its 10-K with the Securities and Exchange Commission; the chart in OpenText's 10-K was used to calculate the bonuses of all eligible employees with the same metrics.  10-K at 71.  Rather than substantially surpassing its targets, as Mr. Cochrane claims, OpenText ultimately fell just short of its revenue target, publicly reporting actual revenue of $1.613 billion, while slightly exceeding its income target, publicly reporting operating income of $486 million.  10-K at 71.[7]  These figures are reproduced in Table A, alongside Mr. Cochrane's proposed calculations.

---

[7]     In fact, but for the GXS acquisition, OpenText would have performed even worse relative to its initial targets.

*Table A.  Comparison of Bonus Calculations*

| $200,000 Target | Demand (Paragraphs 26-32) | | Actual (10-K) | |
|---|---|---|---|---|
| Revenues (*in millions*) (45%) | Performance: $1,624.7<br>Target: $1,461.7<br>Attainment: 111%<br><br>*Paid out at 210% or* | $189,000 | Performance: $1,613<br>Target: $1,666<br>Attainment: 97%<br><br>*Paid out at 70% or* | $63,000 |
| Adjusted Operating Income (*in millions*) (45%) | Performance: $502.7<br>Target: $434.7<br>Attainment: 116%<br><br>*Paid out at 250% or* | $225,000 | Performance: $486<br>Target: $485<br>Attainment: 100%<br><br>*Paid out at 100% or* | $90,000 |
| Board Objectives (10%) | Performance: $N/A<br>Target: $N/A<br>Attainment: 125%<br><br>*Paid out at 300% or* | $60,000 | Performance: $N/A<br>Target: $N/A<br>Attainment: 100%<br><br>*Paid out at 100% or* | $20,000 |
| TOTAL | **$474,000** | | **$173,000** | |

28.     Not only did Mr. Cochrane use outdated targets that ignore the increased projections resulting from GXS (but, on the performance side, includes all of the revenues and income from that acquisition), but this chart also shows how Mr. Cochrane compounded his error by using other inflated performance measurements.  For revenues and operating income, he measures OpenText's performance by using higher, uncited "published results" rather than the performance levels used to determine other executives' bonuses, as set forth in the 10-K. (Demand ¶ 27).[8]  Mr. Cochrane also "estimates" that he outperformed his board objectives by 25%, but he provides no support for this claim.  Indeed, given that the other senior executives

---

[8]     The only support for Mr. Cochrane's proposed adjusted operating income figure is the "Non-GAAP-based income from operations."  10-K at 48.  As noted in the SEC filing, the actual performance figures used for bonus calculations were "adjusted to remove the impact of foreign exchange and, in some cases, reflect certain adjustments relating to the aging of accounts receivable."  10-K at 71 (note to "Fiscal 2014 Actual" figures).

with "personal objectives" listed in the 10-K were paid at 100% attainment, 10-K at 73-74, it is surprising that Mr. Cochrane claims an entitlement of 300%.

29.     Only by reducing the company's actual reported targets applicable to *everyone* else and inflating its results can Mr. Cochrane come up with a $474,000 bonus.  Correcting for these errors, Mr. Cochrane's maximum, unprorated bonus – to the extent he is entitled to any in the first place – would be only $173,000.[9]

### III.    The Tribunal Can Only Determine Claimant's Entitlement to Variable Compensation, Not Quantum.

30.     OpenText accepts the jurisdiction of the Tribunal to determine whether Mr. Cochrane is entitled to any variable compensation under his Employment Agreement, but the calculation of that compensation is beyond the Tribunal's authority.  This is clear from the Plan, the governing document explicitly referenced by the Incentive Compensation Agreement on which Mr. Cochrane relies.  (Demand Ex. 3).

31.     Should the Tribunal decide that Mr. Cochrane is entitled to a variable compensation payment, the power to determine the applicable targets and the extent to which OpenText met those targets rests with the Compensation Review Board and ultimately the Compensation Committee of the Board of Directors.  The Plan provides that "[f]iling for disputes of a calculation must be made within 30 days from the date in which the incentive compensation payment is received.  This must be done through a direct manager."  (Ex. A at p. 6).  The Plan continues:

> Any exceptions and interpretations to the current Plan will be reviewed by the Compensation Review Board (CRB).  *Any decisions made by the CRB shall be final and binding* on any question regarding interpretation or administration of the Plan.  This contributes to consistency and supports the spirit of the Plan – fair and equitable treatment of employees in similar settings and circumstances.

---

[9]     Mr. Cochrane's arguments about the letter agreement's 100% cap are thus irrelevant: Mr. Cochrane's bonus would have been less than his $200,000 target.

32.     Thus, Mr. Cochrane has no right to arbitrate any dispute regarding the administration of the Plan.  The result he seeks – payment of variable compensation to him at levels far in excess of any other Plan participant based on targets lower than those applicable to every other Plan participant – contradicts that explicit corporate policies of "consistency" and "equitable treatment of employees" and is thus beyond the jurisdiction of this Tribunal to award.

<u>CONCLUSION</u>

33.     For the foregoing reason, Mr. Cochrane's claim should be denied in its entirety with all costs of this arbitration proceeding being taxed to Mr. Cochrane.

34.     To the extent he is found to be entitled to any variable compensation, the calculation of any variable compensation ordered should be referred – in accordance with the Plan – to OpenText to determine in a consistent and equitable manner with employees in similar settings and circumstances, with Mr. Cochrane having a right to dispute any calculation within 30 days of payment and have such dispute reviewed by the Compensation Review Board and ultimately the Compensation Committee of the Board of Directors.

35.     Notwithstanding the foregoing, should the Tribunal hold that Mr. Cochrane is entitled to variable compensation and find that it has jurisdiction to determine quantum (over OpenText's objection), he should be awarded not more than $143,057.69, which reflects the prorated portion of Mr. Cochrane's target bonus consistent with the targets and financial performance used to calculate the variable compensation of every other Plan participant.

36.     Finally, not only does Mr. Cochrane have no legal basis to claim interest, but because this entire proceeding (and its corresponding costs and delay) is the result of Mr. Cochrane's rejection of OpenText's offer of a prorated bonus at the time of his separation, an award of interest is improper.  Indeed, unless Mr. Cochrane receives an award substantially in

excess of OpenText's offer, the costs of this arbitration proceeding should be taxed to Mr.

Cochrane.[10]

Dated: December 9, 2014
     New York, New York

             CLEARY GOTTLIEB STEEN & HAMILTON LLP

             By:             
                 Jeffrey A. Rosenthal
                 A Member of the Firm

                 One Liberty Plaza
                 New York, New York 10006
                 Telephone:(212) 225-2000
                 Facsimile: (212) 225-3999

                 *Attorneys for Respondents Open Text Corporation*
                 *and Open Text Inc.*

Of Counsel:

Darryl G. Stein

---

[10]    While OpenText would ordinarily be loath to disclose settlement negotiations, it is Mr. Cochrane who attached OpenText's proposal as Exhibit 2 to his Demand.

# EXHIBIT A

# Worldwide Incentive Compensation Policy

**FY14 Incentive Compensation Plan (ICP)**
**General Plan Provisions**
**(Part 1 of 2)**

**July 01, 2013**



Great Minds Working Together™

# OPENTEXT

*CONFIDENTIAL AND PROPRIETARY*

## INTRODUCTION

The purpose of this document is to outline the terms and conditions that apply to  Open Text Corporation and all its eligible affiliates (the "Company" or "Open Text"), Incentive Compensation Plan (ICP) for Fiscal Year 2014 (FY14) and to provide details used in the development of Individual Compensation Plans.  An individual Incentive Compensation Agreement (ICA) will be prepared for each Eligible Employee.  The individual's Incentive Compensation  Plan (ICP) serves as the basis for determining an employee's compensation.

## PLAN OBJECTIVES

The objective of the Company's Incentive Compensation Plan is to provide a financially attractive and equitable Incentive Compensation (IC) that:

- positions the Company to attract and retain the best professionals, and
- promotes achievement of the Company's annual plan objectives.

## PLAN PARTICIPATION

Eligible participants of the FY14 Incentive Compensation Plan must be employees of the Company ("Eligible Employees").  Temporary, Contract and External employees are not eligible to participate in the ICP.

Nothing in this plan shall be construed to either create or imply the creation of a term contract between the Company and the participant, nor guarantee employment for any length of time.

### New Hires or Internal Transfers
- Eligible employees who are transferred into an incentive compensation position, qualify to participate in the ICP as of their first day in the eligible position.  Their personal VC target and target utilization (if applicable) will be prorated accordingly.  However, attainment for non-utilization components will be based on the full quarter results and applied to their prorated VC target for the period.

### Internal Transfer-outs
- Eligible employees who transfer out of an incentive compensation eligible position will terminate from the ICP on the effective date of the transfer.  Any incentive compensation due shall be determined based on the end date of the transfer.

### Leave of Absence
- Employees who take an approved leave of absence including short term disability are not eligible to participate in the incentive compensation plan while on leave ("Approved Absence").  For the period in which the leave is taken, the payment will be prorated based on actual time worked.  The employee is eligible to participate in the plan upon return to employment as long as they resume employment into a role that qualifies for the incentive compensation plan program.

### Part-Time Employees
- Eligible employees in the plan that are designated as a "Part-Time Employee" will have the target prorated based on their contractual working hours.  If a change in the employee's eligibility status occurs during the period (i.e. ineligible part time to eligible full time), the adjustment will be made as of the effective date of change.

**Termination** – This is addressed under **"TERMS AND CONDITIONS"** below.

CONFIDENTIAL - PROPERTY OF
OPEN TEXT
Copyright © 2013 Open Text Corporation
All Rights Reserved

## EFFECTIVE DATE

The ICP outlined in this document takes effect on July 1, 2013.  It remains in effect until the end of the fiscal year or until revised or terminated by the Company or otherwise in accordance with local law.


## PLAN PHILOSOPHY

The Company's Incentive Compensation Plan was developed with the following philosophies in mind:

- **Align with the Company's Goals and Strategies** – A good Incentive Compensation Plan should provide direction to the team.  The plan should encourage and reward behaviors and results that are aligned with attainment of the Company's goals and provide clear goals and accountabilities for the employee.

- **Keep it Simple** – The plan should be as straightforward as possible.  It should not be so complex that it becomes a distraction to daily business.

- **Base Plan on Objective Measures** – To the extent possible and practical, the plan should be based on objective rather than subjective measures.

- **Equitable** – When compared to the compensation levels of other Company professionals eligible for VC, the Incentive Compensation Plan should result in "equitable compensation."

- **Market Based** – The Company's Incentive Compensation Plan should be comparable to that offered by competing companies.


## PLAN DEFINITIONS

### Eligible Employee
- An employee of the Company, who is eligible for incentive compensation, due to the definition of their role in the Company.

### Fiscal Year
- July 1, 2013 – June 30, 2014.

### Plan Period
- As outlined in the ICP, the period of time which the plan's targets incentivize and pay out based on the plan's payment schedule, which can be either Quarterly or Annual for Incentive plans.   If Quarterly, the plan period start date is based on OpenText's fiscal year quarters (Appendix D), and includes the start date of each quarter, unless as an incentive eligible new hire, the start date would be based on the hire date or date of eligibility being granted.  The OpenText quarterly plan period end would include the last day of the quarter or the last working day if an employee terminates.  If Annual, the plan period would follow OpenText's fiscal year, including the start date of the fiscal, unless stated otherwise as either a new hire or date of eligibility.  The end of the Annual period would include the last day of the fiscal year, or the last working day if an employee terminates.

### Frequency – The number of payments.
- **Annual –** One payment made after the close of the fiscal year reporting period.
- **Quarterly –** Four payments per year occurring after the close of each quarterly reporting period.

### Part-Time Employee
- An employee working less than a Region's standard number of hours in a work week.

**Region**
- Defined as the country in which an employee is hired.

**Normal Business Hours**
- This is defined according to company policy and may differ by Region.

**Financial Reports**
- Internal Operational Management Financial Reports from which the budgeted and actual results for revenue, expense and margin targets are derived.

**Timing of Payments**
- Incentive Compensation payments will be paid in the following quarter, after the close of the fiscal reporting period via the regular payroll cycle typically between 45 to 60 days after the quarter. However, Annual and Q4 payments will not be made until next regular payroll cycle after the Board of Directors meeting, which is normally held in late August.  This is typically 75 to 90 days after the fiscal year close.  All incentive compensation payments are reported as supplementary income and are subject to applicable taxes.  To receive payment the employee must submit a signed individual Incentive Compensation Agreement and have completed a quarter.  <u>Please see **TERMS AND CONDITIONS** below for further information regarding payments and how they relate to termination of employment.</u>

**Target Annual Incentive Compensation**
- The total Target Annual Incentive Compensation amount the participant is eligible to receive at 100% attainment of all Incentive Compensation goals for the fiscal year.

**Target Incentive Compensation Payment**
- The Target Incentive Compensation for each payment period.

**Rounding**
- All attainment calculations will be naturally rounded to whole numbers out to two decimals.  For example, an attainment of 99.51% will round to 100%, versus 99.49% will round to 99%.

**Payout Tables**
- These tables located in an employee's ICA document are designed to payout by attaining each defined step in the table.  Partial percentages of attainment are either rounded up or down per the "**Rounding**" instructions listed above.  Payout percentages are not linear to attainment percentages.

**Role and Plan Types**
- To ensure consistency and equity worldwide, the Eligible Employee's role will determine the plan type.  These roles and the associated plan types will be developed in advance of the start of the fiscal year.


## PLAN DEFINITIONS – Financial Component Specific

**Charge-back**
- The charge-back amount is calculated as the difference between any charge-backs and add-backs for the quarter.  A charge-back amount equals the amount of uncollected revenue that became overdue within the quarter in excess of 90 days from original invoice date.   The charge-back amount is subtracted from the total revenue amount attained within the quarter.  An add-back amount equals the amount of revenue that was received within the quarter where the amount was charged-back in a previous quarter. The add-back amount is added to the total revenue amount attained within the quarter.  Only revenue that has been recognized can be charged-back.

**Exchange Rate Fluctuation**
- All financial targets are set in USD and a set of fixed exchange rates established at the beginning of the fiscal year will be used to convert non-USD currencies.  These set exchange rates are applied to convert the raw revenue, expense and margin numbers into USD throughout the fiscal year.  See **Appendix C – Exchange Rates**.

## PLAN DEFINITIONS – Utilization Specific (Professional Services Only)

**Incentive Compensation Philosophy for Utilization Employees**
- The incentive compensation philosophy of the plan recognizes that there is a certain amount of time in a given period to perform non-utilization activities.  The utilization target in the plan establishes the amount of time that can be attributed to non-utilization activities.  These activities may involve presales, customer support issues, professional development and other duties as assigned by the company.

**Utilization Eligibility**
- All Utilization eligible activities must conform to company and industry quality standards.  If substandard (i.e. if the customer refuses payment, etc) work is performed, utilization eligible hours may be adjusted accordingly.

**Target Utilization Hours**
- The threshold of the Net Available Hours in the Quarter that leads to a 100% payout of the variable compensation in the quarter as per the compensation plan.

**Payout Calculation**
- Direct Billable Activities
  All direct billable activities (time and material per hourly / daily rate) are credited 1:1 per hour billed.

- Indirect Billable Activities
  Activities on engagements that are billed to customers other than being billed by the hour.  For these activities, the manager will determine and approve (prior to the employee commencing with the activity) the number of hours for which the employee will receive credit.

- Other Activities
  Other activities – Activities such as assignments to strategic presales projects, assignments to product repair work, travel time credits, and any other credits are taken into account only after an upfront approval by a Director or VP Professional Services.

  Credit for other activities is added to the credits for billable activities only up to the Target Utilization Hours. If the consultant has reached/overachieved the Target Utilization Hours based on directly or indirectly billable activities no additional credits for other activities will be applied.

  NOTE:  The overall worldwide allocation of the hours that cover "Other Activities" cannot exceed more than 5% of net available hours in the quarter.

- The sum of hours credited for directly billable, indirectly billable and other activities credited is then used to determine the payout level as per the payout table in the plan.

- If applicable, utilization based variable compensation will cover any and all overtime in the quarter.

- The CRB reserves the right to review and approve all other billable activities prior to payout.

| | | |
|---|---|---|
| | **CONFIDENTIAL - PROPERTY OF OPEN TEXT** Copyright © 2013 Open Text Corporation | |
| Version 1.5.29.2013 | All Rights Reserved | Page 5 of 14 |

**Net Available Hours in the Quarter**
- For the specific region, this is the standard number of working hours in a day multiplied by the number of days in the quarter, less the number of hours due to statutory holidays and compulsory military service or Jury Duty (US and Canada Only).  Statutory holidays refer to government regulated public holidays or company designated holidays.

**Time Sheets**
  Utilization is calculated based on time sheets submitted by the employee correctly into Change Point.  It is the employee's responsibility to keep time records up-to-date on a weekly basis as the utilization calculation is based on hours recorded on the system
- Time sheets which are submitted late might not be included for incentive compensation calculation for the current quarter.  Time sheets must be submitted by the end of the final reporting period for the current quarter to be included in incentive compensation calculations.
  **NOTE:**  Any timesheet submitted after the reporting period has been closed will not receive utilization credit for hours on the late time sheet. Compliance with Open Text policies and procedures is required (e.g. Open Text Non-Bill Workflow).

## ADJUSTMENTS

Any adjustments due to correction of the calculations, positive or negative, will be addressed in the following calendar quarter incentive compensation payouts.

## ADJUSTMENT OF FINANCIAL TARGETS AND PLANS

The Compensation Review Board and the CEO/President may, at their sole discretion and subject to applicable law, adjust the Plan performance measures, weightings, targets and/or Plan payouts as they deem necessary during the year to reflect changes in business conditions or other circumstances, including the impact of acquisitions.  Plan adjustments approved by the Compensation Review Board and/or the CEO/President shall be communicated to Eligible Employees via standard employee communications and, subject to applicable law, shall not require the Plan to be re-issued or Eligible Employees to provide any further acceptance of the Plan.  If changes are necessary to plan content and/or constructs during the fiscal year, these would be provided in advance of the period in question (or within the first month of the period) to employees to accept.

## ADJUSTMENT OF FINANCIAL TARGETS AND PLANS (GERMANY ONLY)

If changes are necessary to plan content and/or constructs during the fiscal year, these would be provided in advance of the period in question (or within the first month of the period) to the Works Council in advance of the period for approval.  The Eligible Employee would be required to accept the revised or new plan via ESS. This would exclude the total worldwide numbers (Revenue and Adjusted Operating Income), which would be governed by the previous paragraph.

## DISPUTES

Filing for disputes of a calculation must be made within 30 days from the date in which the incentive compensation payment is received.  This must be done through a direct manager.

## EXCEPTIONS AND INTERPRETATION

Any exceptions and interpretations to the current Plan will be reviewed by the Compensation Review Board (CRB).  Any decisions made by the CRB shall be final and binding on any question regarding interpretation or administration of the Plan.  This contributes to consistency and supports the spirit of the Plan – fair and equitable treatment of employees in similar settings and circumstances.

## WINDFALLS

Calculated payments for the period (Quarterly and/or Annual) that exceed 200% against individual incentive target may be capped and subject to review and approval by the Compensation Review Board (CRB) prior to payment.

## CALCULATION OF INCENTIVE COMPENSATION PAYMENTS

For calculation tables and formulas, please see the personal **Incentive Compensation Agreement (ICA) Document**.

## TERMS AND CONDITIONS

### TERMINATION OF EMPLOYMENT

**I. Voluntary Termination** – In the event of a voluntary resignation, if an employee's last working day is prior to the incentive plan's period payment date, in either the quarterly or annual plan, the quarterly or annual payment will be forfeited.  As such, employees must be present on the day of payment to receive the payment.  The foregoing shall apply except as superseded by statutory and/or other applicable law.

**II. Involuntary Termination –** Should the Company terminate an employee's employment, either as part of a reduction-in-force, or due to the elimination of your position, without cause, the employee's eligibility to participate in the ICP will end on the employee's last day of active employment (last official workday known as the Last Working Day; not official Termination Date or End of Notice Period).  The foregoing shall apply except as superseded by statutory and/or other applicable law.. Employees who are involuntarily terminated are eligible for a prorated payout up to the last working day based on 100% of annual target variable compensation. Employees will be notified of the amounts to be paid in a separate document to their involuntary termination notification, and paid in the following payroll period.

- Example: an employee on an annual incentive plan who is made redundant with a last working day of May 3rd with an annual target bonus of 10,000 will be paid their incentive plan at 100% of target prorated to May 3 from July 1 using a daily rate calculation
  - The formula to be used is:
    *Incentive amount = Daily rate * Days to be paid*
    *Where: daily rate = (target amount / 365 days)*
    *Days to be paid = Last working date – date of the end of the last quarter paid*
  - An employee on an annual incentive plan with an annual target of 10,000, leaving on May 3 will need to be paid for the period from July 1 to May 3. The daily rate is 10,000 / 365 = 27. The days to be paid are May 3 – June 30 = 307 days. The amount to be paid is 8,410.96

- Example: an employee on a quarterly incentive plan who is made redundant with a last working day of May 3rd with an annual target bonus of 10,000 will be paid their incentive plan at 100% of target prorated from the start of the quarter (April 1) to May 3 using a daily rate calculation as their previous quarters will already have been calculated in the normal manner for the first 3 quarters of the year
  - The formula to be used is:
    *Incentive amount = Daily rate * Days to be paid*
    *Where: daily rate = (target amount / 365 days)*
    *Days to be paid = Last working date – date of the end of the last quarter paid*
  - An employee on a quarterly incentive plan with an annual target of 10,000, leaving on May 3 will need to be paid for the period from April 1 to May 3. The daily rate is 10,000 / 365 = 27. The days to be paid are May 3 – March 31 = 33 days. The amount to be paid is 904.11

All Company software, manuals, notebooks, files, correspondence, equipment, credit cards, keys and security passes and other Company owned materials in any form (written or digital) must be returned to the Company before the final financial settlement is concluded.

**III. Termination with cause including Gross Misconduct** – In the event an employee is terminated from the plan as a result of cause including gross misconduct (i.e. where an employee clearly violates an express employer policy or applicable legal requirement), no incentive compensation payment will be made for the current or previous quarterly results, and there will not be eligibility for any future payments. Only outstanding authorized expenses will be reimbursed and only for a period up to 30 days from the termination date. No expenses submitted after 30 days from the date of resignation will be reimbursed unless agreed to in advance by the Senior Vice President Human Resources. Acts of gross misconduct are acts that are intentional, wanton, willful, deliberate, reckless, or in deliberate indifference to an employer's interest, or acts in deliberate violation of the Company's policies.  The foregoing shall apply except as superseded by statutory and/or other applicable law.

**PLAN ADJUSTMENTS –** All outstanding adjustments from previous quarters, positive or negative, will be settled with the employee upon termination.

**PLAN AMENDMENTS –** The Company, at its sole discretion, reserves the unilateral right to change, modify, or amend participation in the ICP of any individual at any time, with or without cause or prior notice.  The foregoing shall apply except as superseded by statutory and/or other applicable law.  The Compensation Review Board (CRB) must approve all Plan changes before they become effective.

**PLAN ACCEPTANCE –** Each Eligible Employee must read and understand the Fiscal Year 2014 Incentive Compensation Plan Details and accept and agree to the regulations stated within.  Incentive compensation payments will not be paid until the above conditions are met.  Each Eligible Employee must electronically accept a copy of the plan via the ESS/MSS system to the Company to document their acceptance of the terms of this program.  The employee's acceptance of the ICA will serve as acknowledgment that this document and any referenced documents represent the entire understanding of the Company and the employee regarding this program and supersede all prior representations, promises or understandings, oral or written, between the parties relating to this matter.  No modification to, addition to, or waiver of, any right or obligation hereunder will be effective unless it is in writing and is signed by the party against which the same is sought to be enforced.  This program shall not be construed to create or to imply the creation of a term contract between Open Text Corporation and any Participant, nor a guarantee of employment for any specific period of time, nor a waiver of an at will employment relationship by either party if such at will employment relationship is permitted by local law. Both the employee and the Company reserve the right to unilaterally terminate the employment contract under the terms of the contract agreement and in accordance with local laws.

Please accept the plan electronically via the ESS/MSS system

AND (for EMEA and APJ only)

An original of the signed version of both the plan provisions and individual plan documents is to be returned to Human Resources.

| EMEA and APJ except UK and Ireland | UK & Ireland |
|---|---|
| HR Services<br>Open Text Software GmbH<br>Werner-von-Siemens-Ring 20<br>85630 Grasbrunn, Germany<br><br>signedplans@opentext.com | HR Services<br>Open Text UK Ltd<br>420 Thames Valley Park Drive<br>Reading, Berkshire<br>RG6 1PU, UK<br><br>signedplans@opentext.com |
| **The Americas**<br><br>Electronic Approval Only | |

## Appendix A – Glossary of Abbreviations

| | |
|---|---|
| WW | – Worldwide |
| GS | – Global Services (Includes PS, LS and TS) |
| PS | – Professional Services |
| LS | – Learning Services |
| PSO | – Packaged Service Offering |
| TS | – Technical Services (Formerly ESP) |
| CS | – Customer Support |
| AM | – Americas |
| LATAM | – Latin America |
| EMEA | – Europe Middle East Africa |
| APAC | – Asia Pacific |
| APJ | – Asia Pacific & Japan |
| GM | – General Manager |
| EVP | – Executive Vice President |
| SVP | – Senior Vice President |
| VC | – Variable Compensation |
| ICP | – Incentive Compensation Plan (Plan Provisions) |
| ICA | – Incentive Compensation Agreement (Individual Plan Document) |

**CONFIDENTIAL - PROPERTY OF OPEN TEXT**
Copyright © 2013 Open Text Corporation
All Rights Reserved

## Appendix B – Financial Component Composition

***Note: All references to Revenue, Expense and Operating Margin are calculated by the Company under U.S. Generally Accepted Accounting Principles***

**Global Services and Customer Support Plans only**

**Total Revenue**
- License
- Consulting
- Learning Services
- Hosting/ASP
- TS revenue
- Other Services

**Total Services Revenue**
- Services
  - Consulting (PS)
  - Learning Services
  - Technical Support (ESP)
  - Package Services

**Total Customer Support Revenue**
- 1st year maintenance
- Renewal maintenance

**Customer Support Operating Margin %**
- Customer Support Margin % = (Total CS Revenue – (Cost of Sales + Operating Expenses)) / (Total CS Revenue)

**Services Operating Margin %**
- Services Margin % = (Total Services Revenue – (Cost of Sales + Operating Expenses)) / (Total Services Revenue)

**All Other Plans (Non-Worldwide Services)**

**Total Revenue**
- License (All)
- Hosting/ASP
- Learning Services
- Other Services
- TS Revenue
- Maintenance Revenue (Recognized)

# Appendix C

## FY14 Currency Exchange Rates

Targets for revenue, margin and / or expenses, where applicable, are set for individuals, teams, and business units in a single home currency early in the fiscal year.

Most business theaters and many territories, however, feature a mix of currencies in their quarterly and annual actual results. Currency exchange rates fluctuate throughout the year and Open Text wants to ensure that employees are protected from the impact of these fluctuations.

For the purpose of calculating incentive compensation, it is necessary to translate the value of non-home currency transactions to the relevant home currency in order to properly calculate incentive compensation payments that may be due. To facilitate this process and to insulate personnel from the fluctuations in the international money market that naturally occur (and over which they have no control), Open Text defines compensation system currency exchange rates in advance for the entire fiscal year.  This process will ensure that employees will not be penalized or rewarded for fluctuations in currency exchange rates.

The table below details the currency exchange rates that will be used during all of FY14 to normalize transaction values to the relevant home currency for the purpose of calculating incentive compensation payments.

| Transaction Currency | Currency Code | Multiplier to convert from Transaction Currency to USD |
|---|---|---|
| Effective Date | Currency Code | July 1, 2013 to June 30, 2014 |
| Australia, Dollars | AUD | 1.027335 |
| Brazil, Brazil Real | BRL | 0.499607 |
| Canada, Dollars | CAD | 0.983284 |
| Chinese, Yuan | CNY | 0.162242 |
| Czech Republic, Koruny | CZK | 0.050649 |
| Denmark, Kroner | DKK | 0.174631 |
| Euro | EUR | 1.302360 |
| Hong Kong, Dollars | HKD | 0.128809 |
| India, Rupees | INR | 0.018368 |
| Japan, Yen | JPY | 0.010216 |
| Korea (South), Won | KRW | 0.000900 |
| Malaysia, Ringgits | MYR | 0.329499 |
| Mexico, Pesos | MXN | 0.082085 |
| New Zealand, Dollars | NZD | 0.850147 |
| Norway, Krone | NOK | 0.170895 |
| Poland, Zlotych | PLN | 0.313078 |
| Romania, New Lei | RON | 0.299902 |
| Singapore, Dollars | SGD | 0.808948 |
| South Africa, Rand | ZAR | 0.109636 |
| Sweden, Kronor | SEK | 0.152114 |
| Switzerland, Francs | CHF | 1.062045 |
| UAE, Dirhams | AED | 0.272271 |
| UK, Pounds | GBP | 1.547689 |

The above exchange rates are in effect for the FY14 plan year beginning July 1, 2013.  These rates are subject to review and change by the CEO/President.  Should a new set of rates be approved by the CEO/President, an updated version of this addendum will be provided to plan participants.

CONFIDENTIAL - PROPERTY OF OPEN TEXT
Copyright © 2013 Open Text Corporation
All Rights Reserved

**Appendix D**

**FY14 OpenText Fiscal Year and Quarter Calendar**

|  | **FROM:** | **TO:** |
|---|---|---|
| FY14 Fiscal Year: | July 1, 2013 | June 30, 2014 |
| Q1 | July 1, 2013 | September 30, 2013 |
| Q2 | October 1, 2013 | December 31, 2013 |
| Q3 | January 1, 2014 | March 31, 2014 |
| Q4 | April 1, 2014 | June 30, 2014 |

# EXHIBIT B

Redacted



Redacted

# EXHIBIT C

Redacted



Redacted



# EXHIBIT D

| | |
|---|---|
| **From:** | Michelle Berry <mberry@opentext.com> |
| **Sent:** | Wednesday, April 30, 2014 9:38 AM |
| **To:** | Kevin Cochrane <kcochran@opentext.com> |
| **Subject:** | FW: Team compensation |

Hi Kevin, I don't think this is going to fly unfortunately.  You are of course free to make the case to Mark but I think the likelihood of it being approved is slim.  Let me know what you want to do and if you want me to close the loop with Nigel.

**From:** Nigel Williams
**Sent:** Wednesday, April 30, 2014 9:34 AM
**To:** Kevin Cochrane
**Cc:** Michelle Berry
**Subject:** Re: Team compensation

Thanks Kevin

Any news on final payment? It is my last day today. If you need anything else from me, email and phone still working until 17.00 local time.

Regards

Nigel

Regards

Nigel

**From:** Kevin Cochrane
**Sent:** Tuesday, April 29, 2014 05:36 PM
**To:** Nigel Williams
**Cc:** Michelle Berry
**Subject:** Re: Team compensation

Nigel:

Appreciate the recommendations.  We'll look at these closely during reviews and will do our best to do the right thing.

I will get an answer to you on your VC comp by end of day today.

Kevin


**Kevin Cochrane**
**Chief Marketing Officer**

Mobile:   (415) 852 0109
LinkedIn:  www.linkedin.com/in/kevinvcochrane
Twitter:   @kevinc2003

Website: http://www.opentext.com/

This email message is confidential, may be privileged, and is intended for the exclusive use of the addressee. Any other person is strictly prohibited from disclosing or reproducing it. If the addressee cannot be reached or is unknown to you, please inform the sender by return email and delete this email message and all copies immediately.

On Apr 29, 2014, at 11:32 AM, Nigel Williams wrote:

Hi Kevin

I wanted to share some comp expectations for FY15 from the team that I think you should be aware of.

1.   Andy Mackay is currently on the low side for his grade.  I recommend salary and variable comp be increased to at least the Mid-level for his grade (M3), specifically £90k salary and £15k variable compensation.
2.   Taufik el Abed should really be on more in his current role (EIFs being processed now) of leading the UK & Northern ADs.   I would recommend £50k + 16k for him
3.   Sean Karl is on the mid-point of M2, he should be really be M3 for FY15 with a commensurate raise to the mid-point of this level.

Lastly, I'd like to enquire as to the status of my final payment?

Regards

Nigel

**Nigel Williams**
VP Field Marketing & Business Development

Phone:    +44 (0)118 984 8153
Website:  www.opentext.com

<image001.gif>

This email message is confidential, may be privileged, and is intended for the exclusive use of the addressee. Any other person is strictly prohibited from disclosing or reproducing it. If the addressee cannot be reached or is unknown to you, please inform the sender by return email and delete this email message and all copies immediately

EXHIBIT E

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, DC 20549**

_____

# FORM 10-K

_____

☒      **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended June 30, 2014 .**

OR

☐      **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from                to**

**Commission file number: 0-27544**

_____

# OPEN TEXT CORPORATION
**(Exact name of Registrant as specified in its charter)**

| | |
|---|---|
| **Canada** | **98-0154400** |
| **(State or other jurisdiction of incorporation or organization)** | **(IRS Employer Identification No.)** |
| | |
| **275 Frank Tompa Drive, Waterloo, Ontario, Canada** | **N2L 0A1** |
| **(Address of principal executive offices)** | **(Zip code)** |

**Registrant's telephone number, including area code: (519) 888-7111**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common stock without par value | NASDAQ Global Select Market |

**Securities registered pursuant to Section 12(g) of the Act:**

**None**
**(Title of Class)**

_____

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒      No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐      No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulations S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒      No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to item 405 of Regulations S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See definition of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒      Accelerated filer ☐      Non-accelerated filer ☐   (Do not check if smaller reporting company)      Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐      No ☒

Aggregate market value of the Registrant's Common Shares held by non-affiliates, based on the closing price of the Common Shares as reported by the NASDAQ Global Select Market ("NASDAQ") on December 31, 2013, the end of the registrant's most recently completed second fiscal quarter, was approximately $4.6 billion. The number of the Registrant's Common Shares outstanding as of July 28, 2014 was 121,787,704.

**DOCUMENTS INCORPORATED BY REFERENCE**

None.

**Reconciliation of selected GAAP-based measures to Non-GAAP-based measures for the year ended June 30, 2014**
*(in thousands except for per share data)*

| | GAAP-based Measures | GAAP-based Measures % of Revenue | Adjustments | Note | Non-GAAP-based Measures | Non-GAAP-based Measures % of Revenue |
|---|---|---|---|---|---|---|
| | | | **Year Ended June 30, 2014** | | | |
| **Cost of revenues** | | | | | | |
| Cloud services | $    135,472 | | $    (342) | (1) | $    135,130 | |
| Customer support | 95,980 | | (754) | (1) | 95,226 | |
| Professional service and other | 196,939 | | (855) | (1) | 196,084 | |
| Amortization of acquired technology-based intangible assets | 69,917 | | (69,917) | (2) | — | |
| **GAAP-based gross profit and gross margin (%) / Non-GAAP-based gross profit and gross margin (%)** | 1,113,029 | 68.5% | 71,868 | (3) | 1,184,897 | 72.9% |
| **Operating expenses** | | | | | | |
| Research and development | 176,834 | | (2,356) | (1) | 174,478 | |
| Sales and marketing | 345,643 | | (7,312) | (1) | 338,331 | |
| General and administrative | 142,450 | | (8,287) | (1) | 134,163 | |
| Amortization of acquired customer-based intangible assets | 81,023 | | (81,023) | (2) | — | |
| Special charges | 31,314 | | (31,314) | (4) | — | |
| **GAAP-based income from operations and operating margin (%) / Non-GAAP-based income from operations and operating margin (%)** | 300,528 | 18.5% | 202,160 | (5) | 502,688 | 30.9% |
| Other income (expense), net | 3,941 | | (3,941) | (6) | — | |
| Provision for (recovery of) income taxes | 58,461 | | 9,569 | (7) | 68,030 | |
| **GAAP-based net income / Non-GAAP-based net income, attributable to OpenText** | 218,125 | | 188,650 | (8) | 406,775 | |
| **GAAP-based earnings per share / Non GAAP-based earnings per share-diluted, attributable to OpenText** | $    1.81 | | $    1.56 | (8) | $    3.37 | |

(1)   Adjustment relates to the exclusion of share based compensation expense from our Non-GAAP-based operating expenses as this expense is excluded from our internal analysis of operating results.

(2)   Adjustment relates to the exclusion of amortization expense from our Non-GAAP-based operating expenses as the timing and frequency of amortization expense is dependent on our acquisitions and is hence excluded from our internal analysis of operating results.

(3)   GAAP-based and Non-GAAP-based gross profit stated in dollars and gross margin stated as a percentage of revenue.

(4)   Adjustment relates to the exclusion of Special charges from our Non-GAAP-based operating expenses as Special charges are generally incurred in the periods following the relevant acquisitions and are not indicative or related to continuing operations and are therefore excluded from our internal analysis of operating results.

(5)   GAAP-based and Non-GAAP-based income from operations stated in dollars and operating margin stated as a percentage of revenue.

(6)   Adjustment relates to the exclusion of Other income (expense) from our Non-GAAP-based operating expenses as Other income (expense) relates primarily to the transactional impact of foreign exchange and is generally not indicative or related to continuing operations and is therefore excluded from our internal analysis of operating results.

(7)   Adjustment relates to differences between the GAAP-based tax provision (recovery) and a Non-GAAP-based tax rate; these rate differences are due to the income tax effects of expenses that are excluded for the purpose of calculating Non-GAAP-based adjusted net income.

(8)   Reconciliation of Non-GAAP-based adjusted net income to GAAP-based net income:

| | | Year Ended June 30, 2014 | |
|---|---|---|---|
| | | | Per share diluted |
| Non-GAAP-based net income, attributable to OpenText | $ | 406,775 | $    3.37 |
| Less: | | | |
| Amortization | | 150,940 | 1.25 |
| Share-based compensation | | 19,906 | 0.17 |
| Special charges | | 31,314 | 0.26 |
| Other (income) expense, net | | (3,941) | (0.03) |
| GAAP-based provision for (recovery of) income taxes | | 58,461 | 0.48 |
| Non-GAAP based provision for income taxes | | (68,030) | (0.57) |
| GAAP-based net income, attributable to OpenText | $ | 218,125 | $    1.81 |

For details on the determination of base salary and our benchmarking process, see "Competitive Compensation" above.

*Perquisites*

Our Named Executive Officers receive a minimal amount of non-cash compensation in the form of executive perquisites. In order to remain competitive in the market place, our executive officers are entitled to some benefits that are not otherwise available to all of our employees. These benefits are provided in the form of a base allowance per year that each Named Executive Officer may choose to use for the purposes of:

- Participating in an annual executive medical physical examination;

- Maintaining membership in a health club;

- Car allowances; and

- Purchasing financial advice and related services.

*Other Benefits*

We provide various employee benefit programs on the same terms to all our employees, including our Named Executive Officers, such as, but not limited to:

- Medical health insurance;

- Dental insurance;

- Life insurance; and

- Tax based retirement savings plans matching contributions.

<u>Short-Term Incentives</u>

In Fiscal 2014, all of our Named Executive Officers, with the exception of Mr. Jenkins, participated in our short-term incentive plan, which is designed to motivate achievement of our short-term corporate goals. Awards made under the short-term incentive plan are made by way of cash payments only.

The amount of the short-term incentive payable to each Named Executive Officer, in general, is based on the ability of each Named Executive Officer to meet pre-established, qualitative and quantitative corporate objectives related to improving shareholder and company value, as applicable, which are reviewed and approved by the Compensation Committee and the Board. For all Named Executive Officers except for Mr. Hunter, these objectives consist of worldwide revenues and worldwide adjusted operating income. Due to Mr. Hunter's more direct influence on our revenues, his objectives consisted of worldwide revenues and margins by product type. In addition to these targets, certain of our Named Executive Officers have goals which are specific to his role, which we refer to as Personal Objectives. Personal Objectives are related to how we operate and grow and may include matters such as succession planning, corporate development initiatives and specific operational objectives.

Worldwide revenues are derived from the "Total Revenues" line of our audited income statement with certain adjustments relating to the aging of accounts receivable. Worldwide revenues are an important variable that helps us to assess our Named Executive Officers' roles in helping us to grow and manage our business.

Worldwide adjusted operating income, which is intended to reflect the operational effectiveness of our leadership, is calculated as total revenues less the total cost of revenues and operating expenses excluding amortization of intangible assets, special charges and stock-based compensation expense. Worldwide adjusted operating income is also adjusted to remove the impact of foreign exchange.

Worldwide revenues by product type are derived from the "License", "Cloud services", and "Professional service and other" lines in our audited income statement, with certain adjustments relating to the aging of accounts receivable. Worldwide margins by the same product types are derived as a ratio of profitability divided by sales. For example, cloud services margins would be calculated by taking its profitability (total cloud services revenues minus total cloud services cost of revenues) divided by total cloud services revenues. Worldwide margins are also adjusted to remove the impact of foreign exchange. These measures are meaningful when assessing the performance of Mr. Hunter, who has primary responsibility for growing and managing the sales side of our business.

We determine short-term performance measures and associated weightings for our Named Executive Officers based on our Named Executive Officer's specific role. We believe that each element of our short-term incentive compensation program requires strong performance from each of our Named Executive Officers in order for the relevant Named Executive Officer to receive the target awards. For details on the determination of targeted awards and our benchmarking process, see "Competitive Compensation" above.

For Fiscal 2014, the following table illustrates the total short-term target awards for each Named Executive Officer, along with the associated weighting of the related performance measures:

| Named Executive Officer | Total Target Award | Worldwide Revenues | Worldwide Adjusted Operating Income | Worldwide License Revenues | Worldwide Professional Service and Cloud Services Revenues | Worldwide Professional Service and Cloud Services Margin | Personal Objectives |
|---|---|---|---|---|---|---|---|
| Mark Barrenechea | $ 932,000 | 45% | 45% | N/A | N/A | N/A | 10% |
| Paul McFeeters | $ 360,855 | 45% | 45% | N/A | N/A | N/A | 10% |
| Jonathan Hunter | $ 500,000 | N/A | N/A | 50% | 25% | 25% | N/A |
| Gordon A. Davies | $ 272,044 | 45% | 45% | N/A | N/A | N/A | 10% |
| Muhi Majzoub | $ 249,000 | 45% | 45% | N/A | N/A | N/A | 10% |

For the short-term incentive award amounts that would be earned at each of threshold, target and maximum levels of performance, for applicable objectives, please see "Grants of Plan-Based Awards for Fiscal 2014" below.

For each performance measure, the Compensation Committee approves the total target award, and the Board applies a threshold and target level of performance. Where applicable, the Board also applies an objective formula for determining the percentage payout under awards for levels of performance above and below threshold and target, although the Board reserves the right in limited circumstances to make positive or negative adjustments if it considers them to be reasonably appropriate. To the extent target performance is exceeded, the award will be proportionately greater. The threshold and target levels and payout formula are set forth below as well as actual performance and payout percentages achieved in Fiscal 2014.

| Objectives (in millions) | Threshold Target (90% target) | Target | Fiscal 2014 Actual (1) | % of Target Actually Achieved | % of Payment per Fiscal 2014 Payout Table |
|---|---|---|---|---|---|
| Worldwide Revenues | $ 1,499 | $ 1,666 | $ 1,613 | 97% | 70% |
| Worldwide Adjusted Operating Income | $ 437 | $ 485 | $ 486 | 100% | 100% |
| Worldwide Professional Service and Cloud Services Revenues | $ 582 | $ 647 | $ 608 | 94% | 55% |
| Worldwide Professional Service and Cloud Services Margin | $ 253 | $ 281 | $ 276 | 98% | 85% |
| Worldwide License Revenues (2) | N/A | $ 328 | $ 306 | 93% | N/A |

(1)   Adjusted to remove the impact of foreign exchange and, in some cases, reflect certain adjustments relating to the aging of accounts receivable.

(2)   There is no threshold target for this performance measure. Payments under the performance measure for worldwide license revenues are determined based on a graduated scale where every dollar of license revenue achieved results in a performance payment. Additionally, because payments are based on a graduated scale, it is not meaningful to show a single percentage of payment per the Fiscal 2014 "Worldwide License Revenues" payout table, as more than one percentage level could be applicable.

The tables set forth below illustrate the percentage of the target awards that are paid to our Named Executives Officers, in accordance with our actual results achieved during Fiscal 2014.

**Worldwide Revenues and Worldwide Professional Service and Cloud Services Revenues Calculations**

| % Attainment | % Payment | % Attainment | % Payment |
|---|---|---|---|
| 0 - 89% | —% | 102% | 150% |
| 90 - 91% | 15% | 103% | 175% |
| 92 - 93% | 40% | 104% | 200% |
| 94 - 95% | 55% | 105% | 225% |
| 96 - 97% | 70% | 106% | 250% |
| 98 - 99% | 85% | 107% | 275% |
| 100% | 100% | 108% and above | 300% cap |
| 101% | 125% | | |

*Formula:*

Actual / Budget = % of Attainment | Example: an attainment of 103% results in a payment of 175%

In Fiscal 2014, we achieved 97% of our worldwide revenue target and 95% of our worldwide services and cloud services revenues target. The "Worldwide Revenues and Professional Service and Cloud Services Revenues Calculations" table above illustrates under the "% Attainment" column that an achievement of 97% of target for the worldwide revenue performance criteria results in an award payment of 70% of the target award amount, and an achievement of 95% of target for the worldwide professional service and cloud services revenues performance criteria results in an award payment of 55% of the target award amount.

### Worldwide Adjusted Operating Income and Worldwide Professional Service and Cloud Services Margin Calculations

| % Attainment | % Payment | % Attainment | % Payment |
|---|---|---|---|
| 0 - 89% | —% | 108% | 180% |
| 90 - 91% | 15% | 109% | 190% |
| 92 - 93% | 40% | 110% | 200% |
| 94 - 95% | 55% | 111% | 210% |
| 96 - 97% | 70% | 112% | 220% |
| 98 - 99% | 85% | 113% | 230% |
| 100% | 100% | 114% | 240% |
| 101% | 110% | 115% | 250% |
| 102% | 120% | 116% | 260% |
| 103% | 130% | 117% | 270% |
| 104% | 140% | 118% | 280% |
| 105% | 150% | 119% | 290% |
| 106% | 160% | 120% and above | 300% cap |
| 107% | 170% | | |
| *Formula:* | | | |
| Actual / Budget = % of Attainment | | Example: an attainment of 103% results in a payment of 130% | |

In Fiscal 2014, we achieved 100% of our worldwide adjusted operating target and 99% of our worldwide professional service and cloud services margin target. The "Worldwide Adjusted Operating Income and Worldwide Professional Service and Cloud Services Margin Calculations" table above illustrates under the "% Attainment" column that an achievement of 100% of target for the worldwide adjusted operating income performance criteria results in an award payment of 100% of the target award amount, and an achievement of 99% of target for the worldwide professional service and cloud services margin performance criteria results in an award payment of 85% of the target award amount.

### Worldwide License Revenues Calculation

| % Attainment | % Payment |
|---|---|
| 0 - 50.01% | 0.053690% |
| 50.01 - 100.01% | 0.080535% |
| 100.01 - 120.01% | 0.117447% |
| 120.01 - 150.01% | 0.167781% |
| 150.01 and above | 0.234894% |

In Fiscal 2014, we achieved 93% of our worldwide license revenues target. License revenues achieved up to, and including, the 50th percentile of our worldwide license revenue target (level 1) was paid at a rate of 0.053690%, resulting in a payment of $0.09 million. License revenues achieved between the 50th percentile and the target amount (level 2) was paid at a rate of 0.080535%, resulting in a payment of $0.11 million. In total, for achieving 93% of our worldwide license revenues target, we made short-term incentive payments of approximately $0.2 million.

The actual short-term incentive award earned by each Named Executive Officer for Fiscal 2014 was determined in accordance with the calculation formulas described above. We have set forth below for each Named Executive Officer the award amount actually paid for Fiscal 2014, and the percentage of target award amount represented by the actual award paid broken out by performance measure as follows:

72

**Mark Barrenechea**

| Performance Measure: | Payable at Target | Payable at Threshold | Actual Payable ($) | Actual Payable (% of Target) |
|---|---|---|---|---|
| Worldwide Revenues | $ 419,400 | $ 62,910 | $ 293,580 | 70% |
| Worldwide Adjusted Operating Income | $ 419,400 | $ 62,910 | 419,400 | 100% |
| Personal Objectives | $ 93,200 | $ 13,980 | 93,200 | 100% |
| Discretionary Award* | N/A | N/A | $ 62,910 | N/A |
| Total | $ 932,000 | $ 139,800 | $ 869,090 | 93% |

**Paul McFeeters**

| Performance Measure: | Payable at Target | Payable at Threshold | Actual Payable ($) | Actual Payable (% of Target) |
|---|---|---|---|---|
| Worldwide Revenues | $ 162,385 | $ 24,358 | $ 113,669 | 70% |
| Worldwide Adjusted Operating Income | $ 162,385 | $ 24,358 | 162,385 | 100% |
| Personal Objectives | $ 36,085 | $ 5,413 | 36,085 | 100% |
| Discretionary Award* | N/A | N/A | $ 24,358 | N/A |
| Total | $ 360,855 | $ 54,129 | $ 336,497 | 93% |

**Jonathan Hunter**

| Performance Measure: | Payable at Target | Payable at Threshold | Actual Payable ($) | Actual Payable (% of Target) |
|---|---|---|---|---|
| Worldwide License Revenues | $ 250,000 | N/A | $ 202,135 | 81% |
| Worldwide Professional Service & Cloud Services Revenues | $ 125,000 | $ 18,750 | 55,470 | 44% |
| Worldwide Professional Service & Cloud Services Margin | $ 125,000 | $ 18,750 | 82,813 | 66% |
| Discretionary Award* | N/A | N/A | $ 54,097 | N/A |
| Total | $ 500,000 | $ 37,500 | $ 394,515 | 79% |

Mr. Hunter received four payments based on his performance measures during Fiscal 2014. Due to his more direct influence on revenue generation, Mr. Hunter had calculations performed each quarter on quarterly revenue and margin achievements (versus quarterly target). As a result, his payouts were different from the payout of the other Named Executive Officers with respect to common performance objectives and the percentages illustrated under the payout tables above.

**Gordon A. Davies**

| Performance Measure: | Payable at Target | Payable at Threshold | Actual Payable ($) | Actual Payable (% of Target) |
|---|---|---|---|---|
| Worldwide Revenues | $ 122,420 | $ 18,363 | $ 85,694 | 70% |
| Worldwide Adjusted Operating Income | $ 122,420 | $ 18,363 | 122,420 | 100% |
| Personal Objectives | $ 27,204 | $ 4,081 | 27,204 | 100% |
| Discretionary Award* | N/A | N/A | $ 18,363 | N/A |
| Total | $ 272,044 | $ 40,807 | $ 253,681 | 93% |

**Muhi Majzoub**

| Performance Measure: | | Payable at Target | | Payable at Threshold | | Actual Payable ($) | Actual Payable (% of Target) |
|---|---|---|---|---|---|---|---|
| Worldwide Revenues | $ | 112,050 | $ | 16,807 | $ | 78,435 | 70% |
| Worldwide Adjusted Operating Income | $ | 112,050 | $ | 16,807 | $ | 112,050 | 100% |
| Personal Objectives | $ | 24,900 | $ | 3,736 | $ | 24,900 | 100% |
| Discretionary Award* | | N/A | | N/A | $ | 16,808 | N/A |
| Total | $ | 249,000 | $ | 37,350 | $ | 232,193 | 93% |

*The Board exercised its discretion in recognition of record overall financial results, and at the same time achieving important business objectives including the integration of four acquisitions.

_Long-Term Incentives_

    As with many North American technology companies, we have a general practice of granting variable long-term incentives to executive officers. Our LTIP represents a significant proportion of our executive officers' total compensation, and its purpose is two-fold: (i) as a component of a competitive compensation package; and (ii) to align the interests of our executive officers with the interests of our shareholders. Grants are generally made annually, consistent with competitive market practice, and vesting occurs over time, to ensure alignment with our performance over the longer term.

    A target value is established by the Compensation Committee for each Named Executive Officer, except for the CEO, whose target value is established by the Board, based on competitive market practice and by our Named Executive Officer's ability to influence financial or operational performance. Grants are generally made annually and are comprised of the components outlined in the table below.

    The target value of the LTIP is split into three components, with 50% represented by Performance Share Units (PSUs), 25% represented by Restricted Share Units (RSUs) and 25% represented by stock options. PSUs and RSUs are based on a rolling three-year program **,** which means that assessment of a Named Executive Officer's performance under each grant is made continuously over the period, but payments on that grant may only be made at the end of the applicable three year term in either cash or Common Shares, at the discretion of the Board. Options granted generally vest over four years. The LTIP payments may also be subject to certain payment limitations in the event of early termination of employment or change in control of the Company. As well, LTIP payments are subject to mandatory repayment or "clawback" in the event of fraud, willful misconduct or gross negligence by any executive officer, including a Named Executive Officer, affecting the financial performance or financial statements of the Company or the price of our Common Shares. The performance targets and the weightings of performance targets under each LTIP are first recommended by the Compensation Committee and then approved by the Board. No dividends are paid or accrued on PSUs or RSUs.

74

# NOTE 18—ACQUISITIONS

## *GXS Group, Inc.*

On January 16, 2014, we acquired GXS Group, Inc. (GXS), a Delaware corporation and leader in cloud-based, business-to-business (B2B) integration. The acquisition combines OpenText's Information Exchange portfolio with GXS' portfolio of B2B integration services and managed services. Total consideration for GXS was $1.2 billion , inclusive of the issuance of 2,595,042 OpenText Common Shares on a post stock-split basis. In accordance with Topic 805, this acquisition was accounted for as a business combination.

The results of operations of GXS have been consolidated with those of OpenText beginning January 16, 2014.

The following tables summarize the preliminary consideration paid for GXS and the amount of the assets acquired and liabilities assumed, as well as the preliminary goodwill recorded as of the acquisition date:

| | | |
|---|---|---|
| Cash consideration paid | $ | 1,101,268 |
| Equity consideration paid | | 116,777 |
| Other amounts currently held back and unpaid | | 606 |
| Preliminary purchase consideration | $ | 1,218,651 |
| Acquisition related costs (included in Special charges in the Consolidated Statements of Income) for the year ended June 30, 2014 | | 7,120 |

As set forth in the purchase agreement, $60.0 million of the total cash consideration paid is currently being held by an escrow agent for indemnification purposes. Subject to certain conditions being met, this consideration will be released to the former equity holders of GXS in the amount of $30.0 million nine months from the date of acquisition, and the remaining amount on the final release date in January 2016.

## Preliminary Purchase Price Allocation

The preliminary purchase price of GXS has been allocated to GXS' tangible and identifiable intangible assets acquired and liabilities assumed, based on their estimated fair values as of the acquisition date. For certain assets and liabilities, the book values as of the balance sheet date have been determined to reflect fair values. The excess of the purchase price over the net tangible and identifiable intangible assets has been recorded as goodwill. The preliminary allocation of the purchase price was based upon a preliminary valuation and our estimates and assumptions are subject to change within the measurement period (up to one year from the acquisition date).

Our preliminary purchase price allocation for GXS is as follows:

| | | |
|---|---|---|
| Current assets (inclusive of cash acquired of $24,382) | $ | 127,406 |
| Non-current tangible assets | | 31,604 |
| Intangible customer assets | | 364,600 |
| Intangible technology assets | | 123,200 |
| Liabilities and non-controlling interest assumed | | (124,399) |
| Total identifiable net assets | | 522,411 |
| Goodwill | | 696,240 |
| Net assets acquired | $ | 1,218,651 |

The finalization of the above purchase price allocation is pending the determination of the finalization of the fair value for taxation-related balances and for potential unrecorded liabilities. We expect to finalize this determination on or before December 31, 2014.

No portion of the goodwill recorded upon the acquisition of GXS is expected to be deductible for tax purposes.

The fair value of current assets acquired includes accounts receivable with a fair value of $94.3 million . The gross amount receivable was $108.2 million of which $13.9 million of this receivable was expected to be uncollectible.

The amount of GXS' revenues and net income included in our Consolidated Statements of Income for the year ended June 30, 2014 is set forth below:

|  |  | January 16, 2014—<br>June 30, 2014 |
|---|---|---|
| Revenues | $ | 211,271 |
| Net income | $ | 8,703 |

The unaudited pro forma revenues and net income of the combined entity for the year ended June 30, 2014 and 2013, respectively, had the acquisition been consummated as of July 1, 2012, are set forth below:

|  |  | Year Ended June 30, | | |
|---|---|---|---|---|
|  |  | 2014 |  | 2013 |
| *Supplemental Unaudited Pro forma Information* |  |  |  |  |
| Total revenues | $ | 1,890,794 | $ | 1,850,658 |
| Net income* | $ | 195,075 | $ | 131,929 |

    * Included in unaudited pro forma net income for the year ended June 30, 2014 are estimated amortization charges relating to the allocated values of intangible assets, estimated interest expense as though the incurrence of debt used to finance the acquisition occurred on July 1, 2012. Excluded from unaudited pro forma net income for the year ended June 30, 2014 are $69.0 million of one-time expenses incurred by GXS on account of the acquisition. These one-time expenses include a) approximately $29.0 million in employee change in control payments, b) approximately $32.0 million of interest expense on account of penalties incurred on the early extinguishment of GXS' debt, as part of the purchase agreement, and c) approximately $8.0 million of transaction fees triggered by the closing of the acquisition.

    The unaudited pro forma financial information in the table above is presented for informational purposes only and is not indicative of the results of operations that would have been achieved if the acquisition had taken place at the beginning of the periods presented or the results that may be realized in the future.

### Cordys Holding B.V.

    On August 15, 2013, we acquired Cordys Holding B.V. (Cordys), a leading provider of Business Process Management (BPM) and case management solutions, offered on one platform with cloud, mobile, and social capabilities, based in Putten, the Netherlands. Total consideration for Cordys was $33.2 million paid in cash ( $30.6 million - net of cash acquired). In accordance with Topic 805, this acquisition was accounted for as a business combination.

    Acquisition-related costs for Cordys included in Special charges in the Consolidated Statements of Income for the year ended June 30, 2014 were $0.9 million .

    The results of operations of Cordys have been consolidated with those of OpenText beginning August 15, 2013.

    The acquisition had no significant impact on revenues and net income for the year ended June 30, 2014. There was also no significant impact on the Company's revenues and net income on a pro forma basis for all periods presented.

### Fiscal 2013

### EasyLink Services International Corporation

    On July 2, 2012, we acquired EasyLink Services International Corporation (EasyLink), a global provider of cloud-based electronic messaging and business integration services, based in Atlanta, Georgia. The acquisition extends our product offerings as we continue to evolve in the Enterprise Information Management market category. Total consideration for EasyLink was $342.3 million , paid in cash. In accordance with Topic 805, this acquisition was accounted for as a business combination.

    The results of operations of EasyLink have been consolidated with those of OpenText beginning July 2, 2012.

    The following tables summarize the consideration paid for EasyLink and the amount of the assets acquired and liabilities assumed, as well as the goodwill recorded as of the acquisition date:

| Cash consideration paid | $ | 342,272 |
|---|---|---|

| Acquisition related costs (included in Special charges in the Consolidated Statements of Income) for the year ended June 30, 2013 | $ | 1,850 |
|---|---|---|

    The recognized amounts of identifiable assets acquired and liabilities assumed, based upon their fair values as of July 2, 2012, are set forth below: